[Civ. No. 9730.   Third Dist.   Jan. 29, 1960.]

ROBERT M. STARK, Appellant, v. DEAN G. STARK, Respondent.

Findlay A. Carter and Jones, Lane, Weaver & Daley for Appellant.

Neumiller, Beardslee, Diehl & Siegert, William E. Siegert and Darrell Glahn for Respondent.

WARNE, J. pro tem.*—This is an appeal from a money judgment rendered by the court sitting without a jury in an action seeking reconveyance of an interest in certain real property.

One Frank Stark, deceased, was the former owner of the property which is the subject of controversy. It was part of 277 acres upon which the deceased operated a dairy ranch. Only a small portion of the ranch was leveled and very little of the land was under irrigation. Prior to his death in 1946 decedent sold a few acres for $300, $400 and $500 an acre. Appellant and respondent, who are brothers, were two of the decedent's 10 heirs, each of whom succeeded to a one-twelfth interest in the subject property, except Stella McGill who succeeded to a three-twelfths interest. Respondent was appointed administrator of the estate of the deceased and as such managed and operated the property. In order to discharge the obligations of the estate and to pay off an old deed of trust respondent borrowed $35,000 and gave as security therefor a deed of trust. In 1948 the property was distributed to the heirs of decedent, subject to the outstanding encumbrance. Respondent continued to operate the ranch and the heirs contributed their proportionate share of the taxes and expenses. Respondent purchased cattle and equipment, leveled the land, dug wells and installed pumps. However, the property continued to be operated at a loss, and in 1949 most of the heirs

---

*Assigned by Chairman of Judicial Council.

wished to sell their interest in the property. Respondent borrowed money and purchased the interests of the Eastern heirs, thereby becoming the owner of an eight-twelfths interest in the property. In 1950 appellant placed his one-twelfth interest in respondent's name in order to enable him to buy the interest of other heirs or to obtain partition and to participate in sales and to refinance. The court found that in December, 1951, the parties agreed that respondent would buy appellant's interest in the property for $5,500, plus a little less than $1,000 which appellant had paid toward taxes and expenses. Thereafter appellant contributed nothing toward the taxes or the upkeep and improvement of the property, nor did respondent pay appellant for his interest. However, the court found that it was agreed that respondent would pay appellant when he was reasonably able. In 1953 respondent wrote appellant:

"Now Bob, you made a deal with me last year which I feel was not too good for you.

"I am not going to offer you any more money for your property but I am offering you a chance to reconsider our deal. If you want to hold your property you can do so by putting all your resources into the ranch. I feel we will all profit & it seems too bad we haven't done this before.

. . . . . . . . . . . . .

"Let me know right away what you want to do & what you can do."

Appellant's reply was bitter but he suggested they divide the property and he take 23 acres. Some months later respondent wrote appellant that he had intended to give him "some money this fall, but as things turned out I just won't have it . . . . This coming year should be a lot better . . . ." Nothing further transpired concerning payment until 1955 when respondent offered to pay appellant $1,500 or $2,500 which appellant told him to keep if he needed it. Subsequently, appellant wrote respondent stating that he was "convinced that a division is the best possible solution. . . . We both agree that the past agreement has been wholly unsatisfactory and we should, after all these years, now negotiate for a fair & equitable solution." Respondent replied that he hoped to fulfill their agreement late that fall or early next year. In May, 1956, appellant wrote his mother that he was glad respondent was finally going to pay him and in reliance thereon he had made commitments. He stated, "All these years I have never pressed for payment even though I wanted my

money, . . .." Respondent wrote appellant that he felt badly that he could not take care of the debt at that time because he did not have the money, but hoped to have some before long. Appellant replied:

"In 1950, when I turned over my share to you to enable you to get full control, you promised that when you got control I could either have my choice of land or you would buy me out. The following year I agreed to sell to you but that agreement hasn't been consummated. Now, will you be willing to deed me back my share? Then I would have exactly what was left to me and so would you, plus the land you have bought."

Respondent answered that he could not agree to appellant's proposition as he had worked too hard. His letter continued:

"We both agreed I would pay you when I could and I am sorry it can't be today. I told you in my letter I would try to have some for you soon. . . ."

Appellant's response was as follows:

"On December 11, 1950, I deeded to you my one-twelfth interest in the farm we inherited from Uncle Frank, and also my interest in the equipment and other things on the farm. At that time it was agreed that I would do this so that you could borrow on the property and then could buy the others out. You were to deed my interest back to me later when I wanted it.

"In December 1951, when we were up there to see you, we discussed this matter and I agreed not to ask for my interest back if you paid me $6,500.00 within one year. This was to cover the price of the land and the return of money paid over by me for taxes & other purposes. You have not yet paid me and it has been more than five years. You will have to admit that I have been more than patient in this whole matter.

"Because you have failed to live up to your side of the agreement, I now want my interest back, and demand that you give me a deed for my one-twelfth interest. I want you to know that I rescind our other agreement and demand a deed."

Instead of sending the demanded deed respondent sent appellant a check for $2,500 which was returned. On April 17, 1957, appellant commenced this action. On January 2, 1958, respondent sent appellant a check for $8,520.83 which was returned.

The trial court found that appellant sold his interest to respondent for $6,376.67, which was not to be paid until

respondent was reasonably able to do so; that respondent was not so able to make any payment prior to September 30, 1956, or to make full payment until January, 1958; and that appellant waived earlier payment. Therefore, the court rendered judgment in favor of appellant in the amount of $8,520.83, that being the selling price of $6,376.67 plus interest at the rate of 6 per cent.

Appellant first contends that in 1950 when he executed the deed conveying his interest in the real property in question and the bill of sale of the personal property to respondent an oral trust was created and that after the trust relationship between the parties had been created respondent, as trustee, purported to purchase the interest of the appellant for himself in violation of sections 2229, 2230, 2235 and 2263 of the Civil Code.

The trial court found "That the reason for said transfer was to permit Defendant to deal with said real property and personal property including the borrowing of money thereon for the purpose of buying out other co-owners of undivided interests in said properties, or the partition of said properties between the co-owners thereof, or for participating in the sale of said properties." It appears that no fraud or mistake was involved, hence there being no wrongful act upon the part of respondent in obtaining title to appellant's interests in the property no constructive trust arose in 1950. (Civ. Code, §§ 2223 and 2224; *Steinberger* v. *Steinberger,* 60 Cal.App.2d 116 [140 P.2d 31].) For like reasons, no constructive trust arose in 1956 when appellant demanded his property back. According to appellant, when he turned over his share of the property to respondent to get full control of the ranch, respondent promised him that he, appellant, could have his choice of either selecting one-twelfth of the land or selling his interest to respondent; that the following year the matter was again discussed by the parties and at that time appellant agreed not to ask for the return of his interest in the property if respondent would pay him $6,500 within one year; that the $6,500 was to cover the price of the land and money paid out by respondent for taxes and other purposes and obligations which respondent assumed. The trial court found, however, that the purchase price was not to be paid until respondent was reasonably able to do so and that respondent was not able to make any payment prior to September 30, 1956, or to make full payment until January, 1958. It further found that

appellant waived earlier payments and also that no confidential relationship existed between the parties. There is ample evidence in the record to support the findings, and under the familiar rule this court is bound by such findings. Further, respondent at no time refused to purchase appellant's interest. At all times after the 1951 agreement, respondent admitted that he owed appellant the agreed purchase price for his interest.

■ It seems to us that if the transaction in its inception created a trust relationship that relationship was terminated in 1951 when the appellant freely and voluntarily agreed not to ask for the return of his interest in the property provided respondent would buy him out, which offer was accepted by respondent and thereafter carried out according to its terms until 1956, when appellant sought to rescind.

[■■ Appellant also contends that there was no memorandum of the purported agreement of sale sufficient to satisfy the provisions of section 1973, subdivision 4, of the Code of Civil Procedure. The trial court found that in December, 1951, appellant "orally sold" to respondent his interest in the real and personal property; that after said sale transaction respondent improved the whole of said property and performed work and labor thereon and expended sums of money thereon; that such acts of respondent were done pursuant to said sale transaction and in reliance thereon; that the real property appreciated in value during the period from December, 1950, to September 30, 1956. The court also found that the correspondence exchanged between the parties subsequent to December, 1950, contained a description of the properties, the consideration for said sales transaction, and the terms of payment; that such correspondence "as was authored by said Plaintiff was signed by him." By referring back to the facts hereinabove stated, and especially to the letters therein quoted, it becomes obvious that such findings are amply supported by the evidence. A series of letters will satisfy the statute when the letters are interrelated. (*Elbert* v. *Los Angeles Gas Co.*, 97 Cal. 244 [32 P. 9]; *Twining* v. *Thompson*, 68 Cal.App.2d 104, 110 [156 P.2d 29].)

In conclusion we feel that the trial court clearly and correctly summed up what took place between the litigants in this case. We quote therefrom:

"All I can find in this case is that in 1951 plaintiff, Robert N. Stark, orally sold his one-twelfth interest in the Stark ranch to his brother, Dean Stark, for the sum of $5,500.00 plus

$876.67 (representing advances), the total sum to bear interest at the rate of six per cent and payable when Dean Stark was financially able to do so.

"There was no confidential relationship, no fraud, misrepresentation or pressure exerted on Robert Stark in this transaction. In fact, Mrs. Stark, their mother, who corroborates this agreement, at the time attempted to persuade her son Robert to stay with the ranch because of its future potentials. This agreement is fairly well documented by the numerous letters exchanged between the brothers between 1951 and September 16, 1956. The letters plainly indicate that this agreement was made.

"The evidence discloses that Robert Stark was motivated in this transaction by the fact that the prospects for the ranch in 1951 looked very dim. It was being operated at a loss. His brother Dean was constantly asking for contributions to defray the ranch's expense. In 1950 the ranch was completely flooded out and most of it being located on the low side of the diverting canal was particularly vulnerable to floods. (It was also flooded in 1955).

"Since 1951 Dean Stark has operated the ranch as the sole proprietor and has generally since 1951 been operating at either a loss or a meager profit, according to the income tax returns, and during the period from '51 to '56 was never able to fulfill his contract with his brother Robert. The evidence indicates that Robert recognized this fact and did not press for payment. In fact, in 1955 when Dean offered to make a part payment Robert permitted Dean to retain the money. His conduct during these years definitely showed a waiver of any payment by Dean. I am unable to agree with the proposition that you can cast the entire burden of operating and improving a ranch on a person for a period of five years under this type of an agreement and at the end of the five years when the land has greatly appreciated in value rescind the oral contract and demand your share of the land. I don't think the Statute of Frauds is involved in this case because of the letters evidencing this agreement but if it is there is sufficient part performance of the contract by Dean to take the transaction out of the Statute. (*Laughton* v. *McDonald,* 61 Cal.App. 678 [215 P. 707]; *Nicolds* v. *Storch,* 67 Cal.App.2d 8 [153 P. 2d 561].)

"I am of the opinion that the evidence introduced in this case sustains nothing more than an action for money due on a

contract for the sale of the land. (*Lavely* v. *Nonemaker*, 212 Cal. 380 [298 P. 976].) ''

No other points presented in the briefs require discussion. The judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.